IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GERMANTOWN CAB COMPANY, :
:
Plaintiff, :
:
v. : CIVIL ACTION NO. 14-4686
:
THE PHILADELPHIA PARKING :
AUTHORITY, WILLIAM SCHMID, :
and CHRISTINE KIRLIN, :
:
Defendants. :

## MEMORANDUM

**Padova, J.**                                                    **June 26, 2018**

Germantown Cab Company's ("GCC") Third Amended Complaint ("TAC") alleges claims
under 42 U.S.C. § 1983 for First Amendment retaliation (Count I) and retaliation conspiracy
(Count II) against the Philadelphia Parking Authority ("PPA"), William Schmid and Christine
Kirlin. The claims arise out of allegedly retaliatory actions taken against GCC for the exercise of
its right to petition the government, specifically its filing of lawsuits challenging the authority of
the PPA to regulate the taxicabs of "partial rights operators" ("PROs") in Philadelphia. Presently
pending is the Defendants' Motion for Summary Judgment. Defendants have filed a statement of
allegedly undisputed facts ("DSOF"). GCC has filed (1) a counterstatement asserting that the bulk
of the Defendants' assertions are in genuine dispute, and (2) its own statement of allegedly
undisputed facts ("PSOF"). Defendants have not filed a response to the PSOF. The parties also
filed a joint appendix ("J.App.") and a factual stipulation ("Stip.") in the related case of Rosemont
Taxicab Co., Inc., et al v. The Philadelphia Parking Auth., et al., Civil Action 16-3601.

For the following reasons, we find that genuine issues of material fact bar the entry of
summary judgment for the PPA on the two Section 1983 claims. However, we conclude that

Defendants Schmid and Kirlin are entitled to qualified immunity since GCC has failed to meet its summary judgment burden to show that they violated a right that was clearly established at the time of their alleged misconduct. Accordingly, we grant Defendants' Motion as to Schmid and Kirlin only.

## I.      SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record that] it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court [ ] that there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, the nonmoving party has the burden of identifying specific facts to show that, to the contrary, a genuine issue of material fact exists for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). That is, summary judgment is appropriate if the nonmoving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

"In evaluating the evidence, we take the facts in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in [their] favor." Morton Int'l, Inc. v. A.E. Staley Mfg.

Co., 343 F.3d 669, 680 (3d Cir. 2003) (internal quotation omitted). "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact." Boykins v. Lucent Techs., Inc., 78 F. Supp. 2d 402, 408 (E.D. Pa. 2000). Indeed, evidence introduced to defeat or support a motion for summary judgment must be capable of being admissible at trial. Callahan v. AEV, Inc., 182 F.3d 237, 252 n.11 (3d Cir. 1999) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993)).

## II.    FIRST AMENDMENT RETALIATION STANDARDS

In order to succeed on a Section 1983 claim, a plaintiff must show that (1) a defendant acted under color of state law; (2) violated the plaintiff's federal constitutional or statutory rights; and (3) the violation of rights caused an injury. Elmore v. Cleary, 399 F.3d 279, 281 (3d Cir. 2005). To establish a First Amendment retaliation claim pursuant to Section 1983, a plaintiff must establish three elements: "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006).[1]

Recognizing that causation is rarely proved by direct evidence, the United States Court of Appeals for the Third Circuit has provided three methods by which causation may be proved circumstantially. First, "a suggestive temporal proximity between the protected activity and the alleged retaliatory action can be probative of causation." Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003) (citing Rauser v. Horn, 241 F.3d 330, 334 (3d Cir. 2001)). However, "the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive

---

[1] GCC alleges in Count II that the Defendants conspired to commit the constitutional violations alleged in Count I. In order to prevail on a conspiracy claim under Section 1983, a plaintiff must prove that persons acting under color of state law conspired to deprive him of a federally protected right. Ridgewood Bd. Of Educ. v. N.E. ex re. M.E., 172 F.3d 238, 254 (3d Cir. 1999). Because the two claims involve the same conduct, we consider the claims together.

before a causal link will be inferred." Id. (quoting Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir. 2003)); see also Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997) ("It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn."). Alternatively, causation may be circumstantially shown through "a pattern of antagonism coupled with timing to establish a causal link" (the "pattern of antagonism" method) or "from the 'evidence gleaned from the record as a whole'" from which a fact finder should infer causation (also called the "catch-all" method). Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) (citing Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir. 1997); Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997); and quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000)). A pattern of antagonism has been described as a "constant barrage" of antagonistic conduct. Robinson v. Se. Pa. Transp. Auth., 982 F.2d 892, 895 (3d Cir. 1993). "Allegations regarding a pattern of antagonism that commenced prior to the plaintiff engaging in protected activity, however, are insufficient to state a First Amendment retaliation claim as they fail to establish a causal link between the protected activity and the allegedly retaliatory conduct." Carroll v. Clifford Twp., Civ. A. No. 12-0553, 2012 WL 5932069, at *4 (M.D. Pa. Nov. 27, 2012) (citing Kriss v. Fayette Cnty., 827 F. Supp. 2d 477, 495 (W.D. Pa. 2011) (pattern of antagonism "refers to intervening antagonism between the time of the protected activity and the time of the alleged retaliatory conduct").

The catch-all method of demonstrating causation requires a plaintiff to show that "the protected speech was a substantial or motivating factor in the alleged acts of retaliation." Buck Foston's New Brunswick LLC v. Cahill, Civ. A. No. 11-3731, 2013 WL 5435289, at *15 (citing Shehee v. City of Wilmington, 67 F. App'x 692, 694 (3d Cir. 2003)). The Third Circuit has further explained that "a plaintiff need not show that the decision was motivated solely by anti-speech

animus, or even that the illegal animus was the dominant or primary motivation for the retaliation. This is less than a showing that a plaintiff's protected conduct was the 'but for' cause of the challenged actions." <u>Shehee</u>, 67 F. App'x at 694 (citing <u>Suppan v. Dadonna</u>, 203 F.3d 228, 236 (3d Cir. 2000). Evidence that regulators engaged in selective enforcement or were inconsistent in their rationale for adverse actions has been held probative of causation under this method. <u>See Holder v. City of Allentown</u>, 987 F.2d 188, 197-98 (3d Cir. 1993) ("a public official may engage in unconstitutional retaliation . . . 'by selective enforcement of an extremely broad prohibitory statute.'") (quoting <u>Cox v. Louisiana</u>, 379 U.S. 536, 557-558 (1965)); <u>Farrell</u>, 206 F.3d at 280-81 (holding that a plaintiff may establish causation by showing inconsistent reasons for termination) (citing <u>Waddell v. Small Tube Prods., Inc.</u>, 799 F.2d 69, 73 (3d Cir. 1986)).

If a plaintiff meets its summary judgment burden to demonstrate First Amendment retaliation, a defendant may defeat the claim "by showing that it would have taken the same action even if the plaintiff had not engaged in the protected activity." <u>DeFlaminis</u>, 480 F.3d at 267 (citing <u>Ambrose v. Twp. of Robinson</u>, 303 F.3d 488, 493 (3d Cir. 2002). "This is often referred to as the 'same decision defense.'" <u>Watson v. Rozum</u>, 834 F.3d 417, 422 (3d Cir. 2016), *cert. denied sub nom.* <u>Coutts v. Watson</u>, 137 S. Ct. 2295 (2017). However, where the record "supports conflicting inferences regarding [a defendant's] motive" in taking an allegedly retaliatory conduct, entering summary judgment is not appropriate. <u>Id.</u> at 423. Moreover, the Third Circuit has cautioned that "a plaintiff can make out a retaliation claim even though the charge against him may have been factually supported." <u>Id.</u> at 426 (citing <u>Hill v. City of Scranton</u>, 411 F.3d 118 (3d. Cir. 2005); <u>see also Hill</u>, 411 F.3d at 130-32 (denying summary judgment on claims brought by police officers that the city had retaliated against them by selectively enforcing an ordinance to punish them for a lawsuit that they had brought even though it was clear that the three officers violated the relevant ordinance).

## III.  TIMELINESS

Defendants argue that a substantial portion of the conduct undergirding GCC's First Amendment claims occurred outside of the limitations period for a Section 1983 action. Section 1983 does not contain a limitations provision. Rather the statute of limitations applicable to Section 1983 actions is the limitation period applicable to personal injury claims in the state where the cause of action arose. See Wallace v. Kato, 549 U.S. 384, 387 (2007). Since GCC's claims arose in Pennsylvania, we apply Pennsylvania's two-year limitations period for personal injury claims. See 42 Pa. Cons. Stat. § 5524(2); Wisniewski v. Fisher, 857 F.3d 152, 157 (3d Cir. 2017) (stating that "[t]he statute of limitations applicable to § 1983 claims in Pennsylvania is two years" (citation omitted)).

### A.  Relation Back

The TAC was filed on March 9, 2016. (Docket No. 51.)  Accordingly, any claim in the TAC that accrued prior to March 9, 2014 is untimely unless it is deemed to relate back to the original Complaint pursuant to Fed. R. Civ. P. 15(c)(1)(B). GCC's original Complaint was filed on August 9, 2014.  (Docket No. 1.)  Under the Rule, an amendment to a pleading relates back to the date of the original when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading."[2]  Fed. R. Civ. P. 15(c)(1)(B).  "[T]he purpose of relation back . . . [is] to balance the interests of the defendant protected by the statute of limitations within the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits."  Krupski v. Costa Crociere S. p. A., 560 U.S. 538, 550 (2010).  "Courts . . . allow relation back when the new claim is based on the same facts as the original pleading and only changes the

---

[2]  Because all Defendants named in the TAC were named in the original Complaint, Rule (c)(1)(C) concerning newly added parties does not apply.

legal theory." 3 James Wm. Moore et al., Moore's Federal Practice ¶ 15.19[2] (3d ed. 2011); see also Roseberry v. City of Philadelphia, Civ. A. No. 14-2814, 2016 WL 826825, at *8 (E.D. Pa. Mar. 3, 2016) (concluding that plaintiff's First Amendment retaliation claim in the amended pleading "clearly relate[d] back to the origination of the lawsuit," where it was based on the identical conduct that formed the basis of plaintiff's employment discrimination claims in the original complaint); 6A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1497 (3d ed. 2010) ("The fact that an amendment changes the legal theory on which the action initially was brought is of no consequence if the factual situation upon which the action depends remains the same and has been brought to defendant's attention by the original pleading.").

We find that GCC's First Amendment retaliation claims contained in the TAC relate back to its original Complaint naming the same defendants. The original Complaint alleged a Due Process violation (Count I) and sought injunctive relief (Count II) arising from Defendants' failure to provide a pre-deprivation hearing before suspending GCC's rights to provide taxicab service. (See Docket No. 1 at ¶ 1.) In Count I, GCC alleged *inter alia* that "the PPA is **motivated by a retaliatory animus** against [GCC] resulting from [GCC's] multiple challenges to the PPA regulatory authority, spread over 22 reported Westlaw reported [sic] decisions." (Id. ¶ 56 (emphasis added).) Following our decision granting in part Defendants' Rule 12(b)(6) Motion and permitting GCC to file an amended complaint (Docket Nos. 25, 26), GCC filed an Amended Complaint ("AC") on May 6, 2015 (Docket No. 28). In that version of the Complaint GCC asserted retaliation claims against the same Defendants, specifically enumerating four of the "22 reported Westlaw" decisions mentioned in the original complaint, detailed other instances where it challenged the PPA's regulatory authority, and alleged retaliatory conduct. (See AC ¶¶ 21-29.) Since the original Complaint alleged Defendants were motivated by a retaliatory animus and Plaintiff's later pleaded retaliation claims arose out of the same regulatory activity, the appropriate

date to judge timeliness is the date of the original Complaint, August 9, 2014. Thus, any claim must have accrued after August 9, 2012 to be considered timely.

### B. Accrual

Federal law determines the question of when a Section 1983 claim accrues. Wallace, 549 U.S. at 388. A claim "accrues when the plaintiff knew or should have known of the injury upon which its action is based." Sameric Corp. of Del. v. City of Philadelphia, 142 F.3d 582, 599 (3d Cir. 1998). "The cause of action accrues even though the full extent of the injury is not then known or predictable." Wallace, 549 U.S. at 391 (citations omitted). Moreover, plaintiffs asserting First Amendment retaliation claims may not employ a "continuing violation" theory to rely upon or revive time barred conduct.[3] O'Connor v. City of Newark, 440 F.3d 125, 127-28 (3d Cir. 2006) (holding that because "First Amendment retaliation claims are always individually actionable, even when relatively minor" — so long as they are sufficient to deter a person of ordinary firmness from exercising his or her First Amendment rights — a claim "will lie for any individual act which meets this 'deterrence threshold'"). Thus, each act that meets the deterrence threshold is a separate First Amendment retaliation claim, and later claims cannot resurrect untimely ones under a continuing violation theory. Id. at 127 (stating that, for First Amendment retaliation claims arising from a public employment context, the principle that "individually actionable allegations cannot be aggregated is of particular import").

---

[3]     Under a continuing violation theory, a cause of action based upon a defendant's continuing conduct may be timely "provided that the last act of that continuing conduct is within the period for the commencement of an action specified by the statute of limitations." Sameric Corp. of Del., Inc. at 599; Montanez v. Sec'y Pa. Dep't of Corr., 773 F.3d 472, 481 (3d Cir. 2014) ("when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period.") (quoting Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2001) (stating that the continuing violation doctrine is an "equitable exception to the timely filing requirement)).

Defendants argue that GCC's retaliation claims are untimely even if they relate back because they accrued more than two years before Plaintiff brought its original Complaint. They cite testimony from Joseph Gabbay, GCC's principal and corporate designee, who stated he first concluded that PPA was retaliating against GCC after the Pennsylvania courts decided <u>Blount v. Philadelphia Parking Authority</u>, 920 A.2d 215 (Pa. Commw. Ct. 2007), more than five years before the original Complaint was filed.[4] Because Gabbay knew or should have known GCC had a retaliation claim, Defendants argue that the claims are time barred in their entirety. We find that Gabbay's testimony is insufficient to bar all of GCC's claims. Rather, only acts of retaliation that occurred more than two years before the filing of the original Complaint are time barred. Since each act of retaliation is sufficient in itself to create a claim, <u>see</u> O'Connor, 440 F.3d at 128, any retaliatory conduct occurring within the statute of limitation period is timely, even if the course of retaliatory conduct began before the limitations period or other specific retaliatory acts are time barred.

## IV. PLAINTIFF'S RETALIATION CLAIMS

### A. Protected Activity

We find that GCC has met its burden of showing that it engaged in protected activity within the limitations period. This activity comprises its litigating cases against the PPA and expressing its opinions about the PPA's activities at public meetings. GCC's timely litigation activity against

---

[4] When asked at his deposition when he first suspected that the PPA was retaliating against GCC for exercising its First Amendment rights, Gabbay testified "Around the period of the time where <u>Blount</u> came out with a decision, and I started to be harassed by a guy named David Rotan under the direction and watch of [Defendant] Bill Schmid." (J.App. Tab H (Joseph Gabbay Dep.) at 91:1-4.) He described being confronted by Schmid, who intimidated him by asking why he was talking with a lawyer and testified "between the regulatory pressure, the assessment, how they treated us after that point, my conversation with Schmid trying to intimidate me for going to an attorney in relation to the <u>Blount</u> case, I've come to the conclusion that's when they started the retaliation process." (<u>Id.</u> at 93:2-8.)

the PPA includes its participation in the prosecution of <u>Sawink v. Philadelphia Parking Authority</u> before the Pennsylvania Commonwealth Court and the Pennsylvania Supreme Court. While this action was filed before the limitations period commenced, GCC engaged in protected activity litigating the case until it was finally resolved by the Pennsylvania Supreme Court on December 17, 2012, which lies within the limitations period. <u>Sawink, Inc. v. Philadelphia Parking Auth.</u>, 34 A.3d 926 (Pa. Commw. Ct. 2012) ("<u>Sawink</u>") (holding that the PPA exceeded its statutory authority when it impounded plaintiffs' taxicabs) <u>aff'd</u> <u>Sawink, Inc. v. Philadelphia Parking Auth.</u>, 57 A.3d 644 (Pa. 2012). GCC was also a plaintiff in <u>Bucks Cnty. Servs., Inc. v. Philadelphia Parking Authority</u>, 71 A.3d 379 (Pa. Commw. Ct. 2013) (the "<u>Second Regulation Litigation</u>"). Although this suit was filed before the Commonwealth Court on November 23, 2011, more than two years before this lawsuit, protected litigation activity continued until the Commonwealth Court issued a decision in the case on November 14, 2014, within the limitations period. <u>See</u> <u>Bucks Cty. Servs., Inc. v. Philadelphia Parking Auth.</u>, 104 A.3d 604 (Pa. Commw. Ct. 2014). GCC also participated in <u>MCT Transp. Inc. v. Philadelphia Parking Authority</u>, 60 A.3d 899, 901 (Pa. Commw. Ct. 2013), aff'd, 81 A.3d 813 (2013), and 83 A.3d 85 (2013) ("<u>MCT Transp.</u>") (holding that budget provisions of Act 94, the Parking Authorities Law, 53 Pa. Con. Stat. § 5707, was an unconstitutional delegation of legislative power), which was filed on July 23, 2012. Protected litigation activity continued in that case until the Pennsylvania Supreme Court affirmed the Commonwealth Court's decision granting summary judgment in part to plaintiffs on November 20, 2013. Finally, GCC filed <u>Germantown Cab Co. v. Philadelphia Parking Authority</u>, Court of Common Pleas No. 140100293 (the "<u>Fifth State Court Action</u>") on January 6, 2014, within the limitations period.[5] The record also includes at least one instance within the limitations period

---

[5] One other lawsuit upon which Plaintiff relies to show protected activity, <u>Germantown Cab Co. v. Philadelphia Parking Authority</u>, 36 A.3d 105 (Pa. 2012) (invalidating the PPA's regulations

where GCC made comments to a public agency about the PPA's activities (see Def. Ex. 136 (May 2, 2013 comments to Independent Regulatory Review Commission ("IRRC")[6] and other instances where GCC challenged the PPA's actions in various courts. (See Def. Ex. 109 (motion for preliminary injunction regarding the PPA's August 2014 "out of service" designation); Def. Ex. 118 (July 22, 2012 motion for preliminary injunction)).

### B. Retaliatory Actions

GCC has met its summary judgment burden to show genuine issues of material fact that Defendants took retaliatory actions against it during the limitations period. First, on January 18, 2013, PPA began the process to draft an amended regulation to remove GCC's ability to pick up "street hails" in Philadelphia under its vice-versa rights granted by the Pennsylvania Public Utility Commission ("PUC").[7] (Pl. Ex. L (1/18/13 Weldon email).) Second, in March 2014, the PPA placed GCC out of service (the "March OOS") on the asserted ground that it failed to file a timely

---

[6] GCC also cites as protected activity numerous other appearances at PPA Board meetings, testimony at hearings, appeals of improperly issued citations, and making oral and written comments against the PPA's efforts to regulate the PRO taxicab industry. (PSOF ¶ 5.) We note that many of the appearances and comments occurred outside the limitations period and a claim based upon them is time barred. (See Def. Ex. 79 (Feb. 15, 2011 comments of GCC attorney to PPA Board); Def. Ex. 80 (Feb. 15, 2011 comments of Joseph Gabbay to PPA Board); Def. Ex. 81 (Feb. 17, 2011 comments of GCC attorney to PPA Board); Def. Ex. 82 (Feb. 18, 2011 Joseph Gabbay comments to PPA Board); Def. Ex. 98 (Sept. 12, 2011 comments of GCC attorney to PPA Board); Def. Ex. 101 (Sept. 23, 2011 Joseph Gabbay letter to IRRC); Def. Ex. 102 (Sept. 23, 2011 Joseph Gabbay comments to IRRC); Def. Ex. 103 (Sept. 24, 2011 Joseph Gabbay comments to IRRC); Def. Ex. 104 (Sept. 26, 2011 Joseph Gabbay comments to IRRC); Def. Ex. 105 (Oct. 3, 2011 GCC comments to IRRC); Def. Ex. 106 (Oct. 3, 2011 Joseph Gabbay response to PPA Comments to IRRC)).

of PRO taxicab companies) ) ("the Original Regulation Litigation"), was finally resolved by the Pennsylvania Supreme Court on January 20, 2012, and thus it was entirely litigated before the limitations period.

[7] The parties use the term "street hail" to refer to a taxicab's response to the random demand for service by a passenger, as opposed to a taxicab responding to a telephone call for service. The PPA's regulations define a "partial-rights taxicab" as a taxicab authorized by the PPA to provide "call or demand" transportation. See 52 Pa. Code § 1011.2

fiscal year 2014 PRO registration renewal form (See Def. Ex. 163 (3/4/14 Letter from PPA to GCC).) Third, in August 2014, the PPA again placed GCC out of service (the "August OOS") for its asserted failure to timely file a FY 2015 registration, even though GCC submitted a copy of its 2014 form for 2015 claiming they were identical, and PPA used the identical FY 2014 filing to calculate an estimate of GCC's FY 2015 monetary assessment. (Def. Ex. 177 (8/8/14 Letter from Schmid to Germantown).) Finally, GCC has produced evidence that the PPA targeted it for an undercover operation, sending a PPA employee named Steven Marshall to apply for work as a GCC driver in order to obtain one of GCC's vehicles to conduct an inspection of the vehicle without GCC's knowledge. (Stip. ¶¶ 94-109 ("the Marshall Incident").[8])

### C. Causation

#### 1. Temporal Proximity

We find that GCC has met it summary judgment burden to show genuine issues of material fact on the issue of causation using the temporal proximity test. GCC has come forward with evidence that at least three non-time barred allegedly retaliatory acts were in unusually suggestive temporal proximity to a protected act. The first retaliatory act is the series of events surrounding the PPA's March OOS designation arising from GCC's refusal to comply with PPA's registration renewal process for FY 2014. This activity began two days after GCC filed the Fifth State Court Action on January 6, 2014. On January 8, 2014, PPA General Counsel Weldon emailed PPA Executive Director Vincent Fenerty stating that GCC had:

> filed a major jury lawsuit (just a writ of summons for now) of some kind against
> PPA, Bill Schmid and who knows who else. I presume that means that all of the

---

[8] Although the Marshall Incident occurred on January 10, 2012, approximately seven months before the limitations period, we find that a cause of action based upon it did not accrue when it occurred. The Stipulation makes clear that GCC did not learn about the incident until it began receiving discovery materials in this lawsuit. (Stip. ¶ 109.) Thus, there is no basis from which one could say that it knew or should have known about the incident prior to the beginning of the limitations period.

stays on prosecutions, suits, etc. is over. Not the classiest way to communicate that fact, but there you are. I think that merits some formal response from us, but I think that we should think it over.

(Pl. Ex. L (1/13/14 Weldon email chain).) Fenerty responded: "Agreed. We shall talk." (Id.) He then added that Defendant Schmidt, who oversees enforcement actions against PROs, "loves his job." (Id.)

The summary judgment record shows that the PPA took no enforcement action against GCC for withholding annual filings and assessment payments prior to 2013. (See Def. Mem. at 35 (admitting that, beginning in FY 2011, GCC ceased filing annual renewals and made no assessment payments for FY 2011 and 2012, and that PPA took no enforcement actions against it) (citing Kirlin Aff. ¶¶ 48-54).) The PPA concedes it changed that policy in the wake of GCC's filing the Fifth State Court Action on January 6, 2014. (See id. at 94 (stating that in January 2014, "after months of settlement negotiations were aborted [by GCC filing the Fifth State Court Action], PPA again explicitly warned Germantown that it would be placed out of service if it did not file its FY 2014 PR-1.").) The record also shows that of the five PROs providing service in Philadelphia, four of them failed to file timely 2014 annual renewals, but only GCC suffered an OOS designation. (See J.App. Tab J (July 7, 2017 Dep. of Christine Kirlin ("Kirlin Dep.")) at 188:3-15 ("Q: Were there any partial-rights companies that were actually in compliance with the 2014 PR-1 filing requirement. A: Yes, there was one."); id. at 188:16-18 (Q: "In March of 2014, were the other, I guess, three besides Germantown, were they placed out of service? A: They were not.").) We find this admission and testimony constitutes evidence of retaliatory selective enforcement that is causally connected to GCC's protected activity through unusually suggestive temporal proximity.

Second, GCC has come forward with evidence raising genuine issues of material fact from which a jury could infer that PPA's monetary demand during the FY 2014 renewal process — seeking to collect administratively imposed fines for citations that were uncollectable because they

were then currently subject to judicial appeal and seeking to collect fines from GCC that were properly assessed against drivers and not against GCC —constituted an attempt to chill GCC from exhausting its appellate rights, its rights to petition the Philadelphia government, or as punishment for filing the Fifth State Court Action. Fenerty gave testimony to the Philadelphia City Counsel in February 2014 in which he singled out GCC as "uncooperative" and "difficult" and a target for unequal enforcement attention due to its filing of lawsuits and its lobbying activity:

> **One particular company has led the fight against the Parking Authority in multiple lawsuits going all the way to the Supreme Court**, and that is, Mr. Ney has said, Germantown Cab Company. They operate inferior cabs. Their drivers are not certified. Their vehicles are not inspected. **They've challenged every regulation that we've had, our budget process, et cetera**, and we've spent an inordinate amount of time in court trying to get this company to come into compliance.
>
> The Legislature has changed statutes after rulings which adversely affected the Parking Authority in the way we operated . . . . So we do have one, as we would say, uncooperative and one company that's not following the statutes that we are having a difficult time with. I don't mind publicly saying it. I think the Council should know, because **I'm sure you had lobbying efforts from this company** that we're being too hard on them. **And we're going to become harder on them**, and when they start lobbying in Council, I would appreciate Council's support for us bringing this company into compliance.

(See Pl. Ex. FF (2/25/14 testimony of Vince Fenerty) at 23-25 (emphasis added). GCC suffered the March 2014 OOS designation six days later on March 4, 2014.

Third, the January 10, 2012 Marshall incident occurred four days after the Commonwealth Court issued its decision in Sawink that was adverse to PPA.

### 2. Pattern-of-Antagonism and Catch-all Method Evidence

To demonstrate (1) the "constant barrage" pattern of antagonism and (2) the catch-all methods of causation, GCC relies upon numerous events both within and before the limitations period. Focusing solely on the events within the limitations period, we find that GCC has met its summary judgment burden to come forward with evidence sufficient to show genuine issues of

material fact on causation under these tests based on the events already discussed with regard to temporal proximity. These include the Marshall Incident, the events leading to the March 2014 and August 2014 OOS designations, the improper monetary demands made as part of the renewal process, and Fenerty's testimony to City Counsel. Additionally, PPA's actions to eliminate GCC's vice versa street hail rights and the series of warrantless seizures of GCC's taxicabs (see Stip. ¶¶ 45-74) — the basis for which the Court has entered summary judgment in Civil Action 14-4686 against the PPA for violating GCC's Fourth and Fourteenth Amendment rights — also constitute evidence of causation under the pattern of antagonism and catch-all tests since they are evidence of "pattern and timing" and that GCC's protected speech was a substantial or motivating factor in the alleged acts of retaliation.

For these reasons, we conclude that GCC has met its summary judgment burden to present evidence sufficient to satisfy the elements of claims for First Amendment retaliation and retaliation conspiracy.

## V.     Defendants' "Same Decision" Defense

Defendants' argue that even if GCC can meet its summary judgment burden on the elements of its claims, they are still entitled to summary judgment since there is no genuine dispute that (1) the PPA has maintained the same fundamental positions regarding its authority to regulate PROs since being vested with that authority by the Pennsylvania Legislature, (2) GCC consistently failed to follow the PPA's rules and regulations leading to enforcement actions, and (3) it would have taken the same enforcement actions irrespective of GCC's protected conduct. Accordingly, Defendants argue they are entitled to judgment as a matter of law on their same decision defense. While the PPA's Motion recounts the history of the statutory and administrative regulation of the PRO taxicab industry, as well as the history of its regulatory interactions with GCC, much of those events fall outside the limitations period. For purposes of adjudicating the Motion, we focus on the

specific allegedly retaliatory incidents that fall within the limitations period and form the basis of GCC's case since each act of retaliation constitutes a discreet cause of action. We consider untimely events only to the extent necessary to understand the context of the specific allegedly retaliatory incidents to which the PPA seeks to apply its same decision defense.

### A.    Elimination of GCC's Vice Versa Street Hail Rights

Prior to 2004, the PUC was solely responsible for the regulation of the taxicab and limousine industries in the Commonwealth of Pennsylvania. (Stip. ¶ 6.) In 2004, the Pennsylvania Legislature passed amendments to the Parking Authorities Law ("Act 94"), codified at 53 Pa. Cons. Stat. §§ 5701-5725, which transferred the regulatory responsibility over taxicab and limousine operations within the City of Philadelphia from the PUC to the PPA. (Id. ¶ 7.) The PUC retained jurisdiction over all other taxicab and limousine service provided outside of Philadelphia (id. ¶ 8) and the PUC continues to subject GCC's vehicles to a number of regulations concerning equipment standards and inspections. (See 52 Pa. Code. §§ 29.401-29.407; Stip., ¶ 43.)

Prior to the passage of Act 94, in 1981 the PUC had adopted a regulation applicable to all taxicabs in Pennsylvania, including those operating in Philadelphia, which provides:

> When engaged in service on an exclusive basis, a call or demand vehicle may transport persons:
>
> (i) In the area authorized by the certificate.
>
> (ii) From a point in the area authorized by the certificate to a point in this Commonwealth.
>
> (iii) From a point in this Commonwealth to a point in the area authorized by the certificate, provided that the request for the transportation is received in the area authorized by the certificate.

(52 Pa. Code § 29.312.) Subparagraphs (ii) and (iii) supply the basis for vice versa service, and the entire regulation applies to both call and demand, i.e. street hail, service engaged on an exclusive

basis.  Thus, we find, PROs had vice versa street hail rights before the PPA was authorized to regulate the Philadelphia taxicab industry by Act 94.[9]

Act 94 included two provisions concerning PROs' street hail rights.  The Legislature provided that a "vehicle which is not authorized by a certificate to provide call or demand service within [Philadelphia] but which is operated by the holder of a certificate of public convenience from the Pennsylvania Public Utility Commission authorizing call or demand service elsewhere in this Commonwealth may transport persons and property:  (i) to [Philadelphia] . . . and (ii) from any point in [Philadelphia] to any point in this Commonwealth beyond [Philadelphia] **if the request for service for such transportation is received by call to its radio dispatch service**."  53 Pa. Cons. Stat. § 5714(d)(1)(ii) (2004) (emphasis added).  Act 94 also provides, however, that PROs such as

---

[9] We note the PPA relies upon the PUC Order that granted GCC's predecessor Penn Cab Company its operating authority in 1996 to support its position that GCC never had vice versa hail rights.  That Order defined Plaintiff's right to transport passengers between points in its designated area, "and from points in the said [designated] area to points outside the area **and vice versa; Subject to the following condition:  That all vehicles must be radio dispatched**."  (Def. Ex. 2 at 2 (emphasis added).)  The scope of the conditional clause "That all vehicles must be radio dispatched" is disputed.  While the PPA argues the conditional clause limits GCC's right to engage in vice versa hail service, GCC asserts that this condition in the tariff simply meant that Penn Cab needed to have an operative radio dispatch system and did not mean that it could only perform vice versa service if dispatched by the radio.  (See GCC Resp. to DSOF ¶ 114.)  We find the condition applied to the vehicle, not the trip.  While GCC has come forward with evidence the requirement applies to the vehicle, not the trip (see Gabbay Dep. at 21:2-24:12; Pl. Ex. C (Sept. 2, 2015 Deposition of William Kilrain) ("Kilrain Dep.") at 42:15 to 42:19 ("Q.  So is it your understanding based on that tariff that Germantown is able to pick up a street hail outside of its territory and take a passenger back to its territory?  A.  That's my impression."), Defendants offer no evidence to support their asserted meaning.  Further, the structure of the PUC Order and the then current state of the regulations of PROs would render Defendants' asserted meaning nonsensical.  A radio dispatch is not demand service; it is a call service.  If the condition applied to the trip and not to the vehicle, it would render the authorization to provide demand service a nullity.

We note further that GCC's 2002 tariff, the last one filed with the PUC before the PPA assumed regulatory responsibility, included the "radio dispatched" condition.  (Def. Ex. 3.)  However, GCC's current tariff, issued by the PUC in 2007 and in effect when the PPA implemented its 2011 Regulations, does not.  (Pl. Ex. A (GCC 2007 PUC Tariff).)  Thus, after the PPA implemented the 2011 Regulations, which also contained no such provision (see Footnote 11), neither the PUC tariff nor the PPA regulations barred GCC from providing vice versa street hail service.

17

GCC that are "Carriers authorized by the [PPA] to provide taxicab service to designated areas within [Philadelphia] on a non-citywide basis pursuant to section 5711(c)(2.1) (relating to power of authority to issue certificates of public convenience) **shall retain their authorization in those areas of [Philadelphia] subject to the exclusive jurisdiction of the [PPA] and orders and regulations of the [PPA] issued under this chapter**." 53 Pa. Cons. Stat. § 5714(d)(2) (emphasis added).

The summary judgment record shows there are genuine issues of material fact whether the PPA has been consistent in its regulation of PROs' retained authorization to provide street hail rights under the authority granted to it by Act 94. The PPA approved its first set of taxicab regulations on June 27, 2005 ("2005 Regulations"). (Def. Ex. 6; Kirlin Aff. ¶ 9.) However, it did not promulgate the 2005 Regulations pursuant to the Commonwealth Documents Law, 45 P.S. §§ 1102, et seq. ("CDL"). (Kirlin Aff. ¶ 10.) The 2005 Regulations were successfully challenged by GCC and other PROs because they were not properly promulgated. See Blount v. Philadelphia Parking Auth., 965 A.2d 226, 227 (Pa. 2009) (holding that the PPA was agency of Commonwealth subject to the requirements of the CDL); Original Regulation Litigation, 36 A.3d 105 (Pa. 2012) (holding that the PPA's regulations were not valid because PPA did not comply with the CDL).

While the challenge was pending, the PPA promulgated a new set of regulations ("the 2008 Regulations"). (Def. Ex. 55; Kirlin Aff., ¶ 14.) However, the 2008 Regulations were also not promulgated in accordance with the CDL (see Kirlin Aff. ¶ 15) and were also invalidated after being challenged by GCC. See Germantown Cab Co. v. Philadelphia Parking Auth., 993 A.2d 933 (Pa. Commw. Ct. 2010). The 2005 Regulations and the 2008 Regulations included a geographic limitation on the hail rights of PROs. (Def. Ex. 6 at § 6.c.; Def. Ex. 55 at §6.[10]) The PPA

---

[10] The provision in the 2005 Regulations applicable to PROs' street hail rights provided that a PRO taxicab could only pick up passengers outside its designated territory to return to a point

submitted another set of proposed regulations to the IRRC and legislative committees on December 28, 2010, and those regulations became effective on December 3, 2011 ("the 2011 Regulations"). (Kirlin Aff. ¶ 22.) The 2011 Regulations did not include the same geographic limitation. (Def. Ex. 97 at §1015.[11])

On March 15, 2013, PPA proposed a new regulation to eliminate the vice versa street hail rights of PROs by reimposing geographic limitations.[12] Following a notice and comment period, the PPA adopted the new regulation, codified at 52 Pa. Code § 1015.2(d), effective on September 13, 2014, which states that a PRO taxicab "may only accept a street hail for taxicab service at a location within the geographical boundaries identified in the partial-rights taxicab certificate holder's [PPA] -approved tariff." (Def. Ex. 192; 52 Pa. Code § 1015.2(d).)

---

inside its territory "if the request for service is received by a call to its dispatch service." (Def. Ex. 6 at § 6.c.) The 2008 Regulations included an identical restriction. (Def. Ex. 55 at § 6.)

[11] We find that the 2011 Regulations did not contain any provision barring GCC's vice versa street hail rights. Section 1015.4(b) provided a description of the "Philadelphia geographical boundaries within which each partial-rights certificate holder is permitted to provide taxicab service" and, for GCC, incorporated the description contained in its PUC tariff **including** the "vice versa" rights clause. (See Def. Ex. 97 at § 1015.4(b)(1)). "Taxicab service" was itself defined in the 2011 Regulations to mean "call or demand service in Philadelphia" performed, "[u]nless the context indicates otherwise," by "partial-rights taxicabs, medallion taxicabs and any other vehicle authorized by the [PPA] to provide call or demand service." (See id. at § 1011.2) We find that the context of Section 1011.2 cannot be read to indicate a geographic limitation since the 2005 and 2008 versions were replaced by the 2011 Regulations, and the PPA incorporated GCC's vice versa rights into the geographic boundary description of the new version. This finding is supported by the undisputed fact, discussed next, that the PPA thereafter amended the 2011 Regulations to reimpose the limitation.

[12] In proposing the regulation, the PPA stated that it "will clarify two important and long established service prohibitions applicable to partial-rights taxicab companies. . . . Those limitations prohibit intra-Philadelphia taxicab service between two points that are not within the geographical boundaries of the respective partial-rights taxicab company, as well as the initiation of taxicab service through a street hail initiated in Philadelphia not within the geographic boundaries of respective partial-rights taxicab company [sic]." (Def. Ex. 191 at 3; Def. Ex. 192 at 3.)

Despite the inconsistency in its regulations, the PPA nonetheless asserts it has been consistent in its position regarding the condition of radio dispatch for vice versa demand service, GCC never actually possessed vice versa street hail rights, and it is accordingly entitled to the same decision defense with regard to its decision to formally eliminate GCC's vice versa hail rights by promulgating Section 1015.2(d). We find from the summary judgment record that the factual basis for this contention is in genuine dispute. It is disputed by GCC's principal and corporate designee. (See Def. Ex. 100 (Sept. 22, 2011 testimony of Jacob Gabbay) at 39[13]).) It is also disputed by the PUC's Regional Manager for Philadelphia who testified that GCC's tariff authorizes it "to pick up a street hail outside of its territory and take a passenger back to its territory[.]" (Kilrain Dep. at 42:15 to 42:19.) Also, Defendant Schmid agreed in testimony in 2011 that GCC had vice versa demand rights, meaning "that they can do trips both that originate in their territory and end outside their territory, and also from points outside their territory that terminate inside their territory." (Pl. Ex. B (July 23, 2011 testimony of William Schmid) at 72.)

What is undisputed is that the 2011 Regulations omitted the radio dispatch requirement. While the PPA asserts that, in the process of promulgating the 2011 Regulations, it "erroneously omitted any provision addressing the operating rights of PROs, such as those included in Act 94, PPA's 2005 and 2008 Regulations and the PUC's much older regulation," (see DSOF ¶ 123 (citing Weldon Dep. at 161; Kirlin Dep. at 124-127)), we find there is a genuine issue of material fact

---

[13] Gabbay was asked by PPA counsel: "Q. I'm asking you if you received any citations . . . for a case where a driver picked up a hail on Main Street [in Manayunk, outside of GCC's territory]? In the five years, did you even get one of those, that's all I'm asking. A. We got citations. We challenged that, because we're allowed to pick up a hail from the place to our properties and back and forth. So no matter what you're telling me, it's all challenged in court. Everything that we have to say, we are saying it in court. That's why we are challenging every one of them that you — Q. Does your authority give you the right to pick people up that are not called on the telephone? A. Yes. From one point to our point, yes, we do. Q. Even without a phone call? A. Yes, sir. (Def. Ex. 100 (Sept. 22, 2011 testimony of Jacob Gabbay at 39-40).)

regarding whether the restriction was removed "erroneously."  Referring to the absence of the restriction in the 2011 Regulation, General Counsel Weldon was asked:

> Q.      You don't see any limitation written in by the Parking Authority in this proposed regulation that you helped create?
>
> A.      That was ultimately removed.  Remember, one of the comments, one of the reasons we took it out is more than one person complained that the language was wrong. . . .  So to the extent that we took it out because the language was wrong, I don't think that's a basis for me to change my opinion on language that people think is wrong.
>
> Q.      Why did the Parking Authority not include the language you continue to refer to now in 2017 back when you personally were involved in writing these regulations in 2010?
>
> . . .
>
> A.      Because they made a mistake. . . .  I have no idea, Brett.  But the bottom line is that was draft language; it was reviewed later, and it was taken out.  It was a decision.  There was obviously a reason that it was taken out.  It's not — it never became a regulation.

(Weldon Dep. at 160-62.)  Defendants do not explain how, if it "was a decision" and there "was obviously a reason," the omission could have been merely erroneous.

Accordingly, we conclude that there are genuine issues of fact concerning whether PPA has been consistent in its position regarding GCC's vice versa street hail rights.  Accepting all inferences in favor of GCC as the non-moving party, at the time the PPA eliminated those rights there was no regulatory or tariff-based restriction on GCC's vice versa hail rights even though Act 94 provided the PPA **could** require a radio dispatch condition for a request made in Philadelphia for a point outside Philadelphia.  Because a plaintiff can still make out a retaliation claim even where the allegedly retaliatory conduct may have been factually supported, we find that Defendants

cannot show that they are entitled to the same decision defense as a matter of law on the vice versa hail rights cancellation.[14]

### B.     The March 2014 Assessment and the two OOS Designations

Defendants argue they are entitled as a matter of law to invoke the same decision defense regarding the 2014 assessment and the two OOS designations because the record "is undisputable that PPA has, since 2006, consistently taken the position that Germantown — no different than any other Medallion or Partial Rights operator — was required to submit annual renewal filings as required by Act 94 itself.  Just as consistently, Germantown has resisted this requirement."  (Def. Mem. at 94 (emphasis omitted).)  We find the record does not support Defendants' entitlement to this defense as a matter of law.

It is undisputed that, after the Commonwealth Court's 2010 decision in the <u>Original Regulation Litigation</u>, GCC did not pay assessments and did not submit annual renewal filings.  (Def. Exs. 92, 108.)  It is also undisputed that PPA took no enforcement action against GCC for withholding its annual filings and assessment payments prior to 2013.  (Kirlin Aff. ¶¶ 50, 54, 62).  PPA changed its conduct a week after GCC filed suit in the <u>Fifth State Court Action</u> on January 6,

---

[14] Defendants also argue that, assuming GCC were to prevail on its claim regarding its vice versa hail rights, its claim to have suffered resulting damages is improper since it is based upon an email sent at the direction of PPA's General Counsel to GCC's counsel as part of the parties' settlement negotiations.  (<u>See</u> Def. Ex. 189 (Pls.' Supp. Resp. to Def.'s Interrogatories and Requests for Production of Documents) at 5) (citing Def. Ex. 145 (Oct. 15, 2013 email from Patricia DeMarco to Mike Henry).)  Defendants argue that (1) offers of settlement are not admissible evidence under Fed. R. Evid. 408, and (2) the hypothetical discussion in the email of how many medallions GCC might need is not evidence of the value of its lost hail rights.  GCC responds that it has submitted competent evidence of damages in the form of:  legal fees incurred in the litigation of its vice versa hail rights and the defense of citations, penalties incurred for street hail citations, the loss of profits from having its vehicles impounded or placed out of service, and the loss of time its principals have had to devote to the problem.  For the purposes of the summary judgment motion, we find that GCC has met its burden to show damages on its retaliation claim.  We express no opinion on whether the email evidence is proper and deferred any consideration to *in limine* motions should the case go to trial.

2014, when it demanded GCC and the other PROs file 2014 PR-1 registration renewal forms, by then already long overdue, or face enforcement action. (Def. Exs. 147-153; Kirlin Aff. ¶ 66.) As of January, 2014, only GCC and BCS had not filed FY 2014 PR-1s. (Kirlin Aff. ¶ 67.) Only one PRO had paid the 2014 assessment. (Kirlin Aff. ¶ 73.) When GCC failed to file and pay its assessment, it was placed out of service on March 4, 2014. (Def. Ex. 163.) While Defendants argue that GCC's retaliation claim based on the March 2014 OOS fails because PPA has consistently treated GCC no differently from any other medallion or PRO in requiring the submission of annual renewal filings, the record contains evidence creating a genuine issue of material fact regarding selective enforcement of those annual filing requirements.

Defendants concede that they did not take any enforcement action against BCS for not filing its FY 2014 PR-1, for the stated reason that BCS had filed its FY 2015 form and "TLD then had current information for BCS." (Def. Mem. at 97.) But PPA refused to permit GCC to use the "current information" in its FY 2014 filing for FY 2015 — the basis upon which PPA imposed the August 2014 OOS — even though the 2014 form was deemed complete by PPA the same day that the 2015 form was due. (Pl. Ex. T (April 1, 2014 email from Kirlin to Schmid and Ney stating "[a]s of today, Germantown Cab Co. has completed the 2014 PR-1 form by filing all required information).) Also, as of March 2014 four of the five PROs failed to fully complete the renewal and assessment payment process, yet only GCC was placed out-of-service. (Kirlin Dep. at 188:3 to 15 ("Q: Were there any partial-rights companies that were actually in compliance with the 2014 PR-1 filing requirement. A: Yes, there was one."); id. at 188:16-18 (Q: "In March of 2014, were the other, I guess, three besides Germantown, were they placed out of service? A: They were not."). This creates a genuine issue of fact on Defendants' contention that there was no material difference in the way the PPA treated GCC and other operators.

### C.    The Marshall Incident

Finally, the January 10, 2012 Marshall Incident occurred four days after the Commonwealth Court issued its decision in <u>Sawink</u> and just three weeks after GCC filed the <u>Second Regulation Litigation</u>.  Defendants do not discuss this instance of alleged retaliatory conduct in their same decision defense argument.  Accordingly, we deny the Motion with respect to this alleged incident of retaliation.

## VI.    Qualified Immunity

Defendants Schmid and Kirlin argue they are entitled to qualified immunity on GCC's First Amendment retaliation and conspiracy claims.  "The doctrine of qualified immunity shields government officials from civil liability for constitutional violations only if 'their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'"  <u>Kedra v. Schroeter</u>, 876 F.3d 424, 434 (3d Cir. 2017) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 638 (1987)).  In considering whether the doctrine applies, "courts perform a two-pronged analysis to determine:  (1) 'whether the facts that [the] plaintiff has alleged . . . make out a violation of a constitutional right,' and (2) 'whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct.'"  <u>Id.</u> (quoting <u>Pearson v. Callahan</u>, 555 U.S. 223, 232 (2009)).  "Summary judgment based on qualified immunity should be granted when 'the law did not put the [public official] on notice that his conduct would be clearly unlawful.'"  <u>Zaloga v. Borough of Moosic</u>, 841 F.3d 170, 174 (3d Cir. 2016) (quoting <u>Saucier v. Katz</u>, 533 U.S. 194, 202 (2001).  As GCC has met its summary judgment burden to make out a retaliation claim, Schmid's and Kirlin's entitlement to qualified immunity turns on the "clearly established" prong.

In <u>Zaloga</u>, the Third Circuit explained the "clearly established" prong stating that "[t]he standard for qualified immunity is tilted in favor of shielding government actors and 'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly

violate the law.'" Id. at 175 (quoting <u>Hunter v. Bryant</u>, 502 U.S. 224, 229 (1991).  Thus, in order

to defeat the qualified immunity defense, plaintiffs must establish that

> *every reasonable official* would have understood that what he is doing violates that
> right. In other words, existing precedent must have placed the statutory or
> constitutional question beyond debate. This "clearly established" standard . . .
> ensur[es] that officials can reasonably . . . anticipate when their conduct may give
> rise to liability for damages.

<u>Id.</u> (alterations in original) (quoting <u>Reichle v. Howards</u>, ___ U.S. ___, 132 S.Ct. 2088, 2093

(2012) and citing <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 741 (2011)).  Moreover, "[t]he Supreme Court

has repeatedly stressed that, for purposes of determining whether a right is so well settled as to

defeat qualified immunity, it "must be established not as a broad general proposition, but in a

particularized sense so that the contours of the right are clear to a reasonable official[.]"  <u>Id.</u>

(quoting <u>Reichle</u>, 132 S.Ct. at 2094).  Thus, the Third Circuit has instructed that "the right should

be framed in terms specific enough to put "every reasonable official" on notice of it, and the more

specific the precedent, the more likely it is that a right will meet that threshold."  <u>Id.</u>

For purposes of determining qualified immunity, the First Amendment right involved in

GCC's timely retaliation claims, that is, the ones where "existing precedent must have placed the

statutory or constitutional question beyond debate," <u>id.</u> at 175 (quotation omitted), is not the

general right to be free from retaliation.  Rather, we must look to see if the Defendants' alleged

specific conduct is unconstitutional "beyond debate."  For Defendants Schmid and Kirlin, that

conduct is their roles in serving the two OOS designations and leveling the allegedly improper

assessments, as well Schmid's involvement in the Marshall Incident.  We find, in the absence of

any relevant existing precedents condemning these types of specific regulatory activities from

which we can conclude that every reasonable official would recognize they were exceeding their

bounds, that Schmid and Kirlin are entitled to qualified immunity.

## VII.    CONCLUSION

For the reasons stated above, we grant Defendants' Motion for Summary Judgment only as to the issue of qualified immunity for Defendants Schmid and Kirlin.  We conclude that GCC has satisfied its burden to establish that there are genuine issues of material fact that the PPA retaliated against it for the exercise of its First Amendment rights and has produced evidence to show disputed issues of genuine fact whether the PPA is entitled to the same decision defense.  Consequently, we deny the Motion as to the retaliation claim and the retaliation conspiracy claim asserted by GCC.  An appropriate Order follows.

BY THE COURT:


/s/ John R. Padova

_____

John R. Padova, J.